**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| PERRY C. BLAIR,<br><br>    Plaintiff,<br><br>v.<br><br>CDCR, et al.,<br><br>    Defendants. | Case No.: 1:14-cv-01156-LJO-SAB (PC)<br><br>FINDINGS AND RECOMMENDATIONS FOLLOWING EVIDENTIARY HEARING ON EXHAUSTION OF ADMINISTRATIVE REMEDIES |

Plaintiff Perry C. Blair is appearing pro se and in forma pauperis in this civil rights action pursuant to 42 U.S.C. § 1983.

**I.**

**RELEVANT BACKGROUND**

This action is proceeding against Defendants Alva, Franco and O'Daniels for deliberate indifference, against Defendants Santos, Esqueda, and Ybarra for a due process violation, and against Defendant Johnson for retaliation.

On August 30, 2017, Defendants filed an answer to the complaint. On September 1, 2017, the Court issued the discovery and scheduling order.

On February 22, 2018, Defendants filed an exhaustion-related motion for summary judgment. Plaintiff filed an opposition on April 2, 2018, and Defendants filed a reply on April 9, 2018.

///

1

On May 25, 2018, the undersigned issued Findings and Recommendations recommending that Defendants' be granted in part and denied in part, subject to an evidentiary hearing. More specifically, it was recommended that Defendants' motion for summary judgment be granted as to Plaintiff's Eighth Amendment claim regarding labeling him a snitch against Defendants Sanchez, Chan, Alva, Johnson, Ybarra, Esqueda and Santos, and Plaintiff's Eighth Amendment claim regarding housing Plaintiff with inmate Russ against Defendants Chan and Sanchez. It was further recommended that Defendants' motion for summary judgment be denied as to Plaintiff's Eighth Amendment claim against Defendant Alva for housing Plaintiff with inmate Baker and Due Process claim against Defendants Ybarra.

On July 20, 2018, the Findings and Recommendations were adopted in full.

On August 8, 2018, the undersigned set an Albino evidentiary hearing to determine the disputed issues of fact regarding exhaustion of the administrative remedies.

After a continuance, the evidentiary hearing was conducted on October 24, 2018, before the undersigned.

Tyler Onitsuka and Michell Angus appeared on behalf of Defendants, and Plaintiff appeared pro se on behalf of himself. Witnesses Jennifer Cota, Jorge Dominquez, Albert Gabriel Chan, Brian O'Daniels testified on behalf of the defense, and Plaintiff testified on behalf of himself. Defendants' Exhibits A, B, C pages 2-7, D, and F pages 2-4, and Plaintiff's Exhibits 3 pages 8-9 and 4, were admitted into evidence. At the conclusion of the hearing, the matter was taken under submission for written Findings and Recommendations.

## II.

## ALLEGATIONS IN SECOND AMENDED COMPLAINT

Sometime around January 2011, Plaintiff was escorted from the administrative segregation and assigned to share a cell with inmate Rousie. Plaintiff and Rousie were not compatible cellmates based on their rival gang affiliations.

Thereafter Plaintiff was locked in a three by two-foot shower from 8:00 a.m. to 6:00 p.m. and both Plaintiff and Rousie were threatened with confiscation of their personal property, placement in segregation, and issuance of a rules violation report. Based on the nature of the threats, Plaintiff and

inmate Rousie agreed to be housed as cellmates, and Plaintiff believed Rousie would be placed in a different cell within one day.

On March 26, 2013, an inmate manufactured weapon was discovered inside the cell. As a result, Plaintiff and inmate Rousie were transferred to administrative segregation and eventually to the security housing unit at California Substance Abuse and Treatment Facility at Corcoran State Prison (SATF).

Sometime around December 2012, inmate Trotter was released from the hole and was re-assigned to a dwelling which was occupied by Plaintiff. Plaintiff informed the initiating officer that he and inmate Trotter were not compatible cellmates because they were from rival gangs. The initiating officer threatened both inmates with threats of confiscation of their personal property, rules violations, and placement in the hole for delaying a peace officer in their duties and refusing a housing assignment. In fear of the consequences both inmates decided to comply with the officer's demands on reliance that inmate Trotter would be relocated the following morning. However, six months thereafter, Plaintiff was still housed with inmate Trotter.

On May 14, 2013, Plaintiff was informed that marijuana was found in his cell on February 5, 2013, by officer Garza. Officer Garza issued a rules violation report to Plaintiff and inmate Trotter.

On June 7, 2013, officer M. Lefler conducted a search of Plaintiff and inmate Trotter's cell and an inmate manufactured weapon was discovered in the toilet drain. Plaintiff was at the door and tried to flush it down the toilet. Inmate Trotter denied knowledge of the weapon and Plaintiff admitted it belonged to him. Plaintiff stated that he intended to use it to defend himself against inmate Trotter. As a result of the incident, inmate Trotter and Plaintiff were separated.

While awaiting the administrative hearing, officer John Doe initiated a cell compaction with inmate Baker who is rival gang member. Both inmates informed the initiating officer of their rival gang status and the officer responded "if ya'll refuse to signed [sic] the chrono and be cellies your['e] going to forfeit 90 days, lo[se] 10 days of yard, 90 days of dayroom, 90 days of telephone, 90 days of canteen, 90 days of personal property and extension of your SHU-terms." With the reprisal in mind, the inmates decided to accept the living arrangements.

///

3

After a week after being placed in administrative segregation, inmate Trotter sent his investigative employee officer Garza to interview Plaintiff with regard to the possession of his weapon charge. Plaintiff informed Garza that "the weapon belonged to the Plaintiff and it was to be used on her client in the event that inmate Trotter tried to attack him, and that the weapon was never taken to yard."

On August 8, 2013, Lieutenant J. Johnson conducted the hearing on the rules violation report for possession of a controlled substance. Plaintiff presented evidence that the contraband belonged to Plaintiff because it was discovered on the upper locker that was assigned to him. Plaintiff stated that he "didn't know anything about the drugs until 5-1-2013, when I was served with the notice of the 115 R.V.R. for drugs found on 2-5-2013. As far as I'm concerned the correctional officer could of planted it and C.O. Ibbs logic of it belong [sic] to me due to my bunk assignment that is discredited by your C.O. Welsh testimony."

Lieutenant Johnson opted to call C.O. Ibbs by way of a phone conference to ask "when you discovered the controlled substance in [building] 5, [cell] 101 on the upper locked was it out in the open where you didn't have to search for it because I'm hearing Blair's 115 for constructive possession?" The Plaintiff interjected with, "you mind [sic] as well just tell him exactly what to say if your['e] going to lead him like I'm some type of idiot." Johnson ended the telephone conversation with Ibbs and informed Plaintiff, "I'm finding you guilty possession-constructive possession." Plaintiff inquired as to the meaning of constructive possession. Johnson replied, "it means you had knowledge of and access to the contraband and therefore guilty of constructive possession." Plaintiff stated "that's crazy your telling me an inmate is guilty regardless of the circumstances. Even their cellie admits guilt as long as they were in the cell … I just testified that I had and still have no knowledge of the drugs, where they came from, or even when they were discovered and your own C.O. debunked your other C.O.'s logic and case, so now your using a loop hole which is basically indisputable as long as I occupied the cell with another inmate. That being the case I'm requesting single cell status because your rule places me in a position whether it is impossible to exist in a cell with another inmate without the threat of violence. Due to the fact that I'm therefore obligated to searched [sic] through all of my cellies personal property and dispose of whatever contraband they

4

may possess. Just search through a cellie's personal property is a violation of cell conduct which will result in a physical altercation especially here on the high security facility on top of this your['e] instructing us to dispose of them contraband or run to the staff to be labeled a rat… That's a death sentence in here. It's already bad enough your['e] forcing us to house with rival gang members against our will." Lieutenant Johnson responded "your['e] not obligated to house with rival gang members, you can refuse incompatible cellies." Plaintiff informed Johnson, "yeah right, my last three cellies were incompatible and we tried to inform your staff of our rival gang status each time we were threatened with disciplinary reprisal for refusing to accept each other as cellies. Johnson indicated that it was an exception and rarely happens. Plaintiff then informed Johnson that he and his current cellie were rival gang members. In response, Lieutenant Johnson insulted Plaintiff by telling him to just "handle your business [and] if your['e] scared go S.N.Y." Plaintiff replied "nah your['e] the bitch cuz [sic] back in the dayz [sic] C.O.s would actually fight the inmates instead of waiting until we're handcuffed to disrespect us. Now ya'll try to cause disruption amongst us so you can sit back and entertain yourselfs and write us up."

Immediately after the hearing, Lieutenant Johnson, Lieutenant Ybarra, Sergeant Chan, officer O'Daniels, officer Franco, officer Alva, and officer Esqueda started telling all of the inmates housed in building E-1 that Plaintiff "was a snitch and need to get [sic] dealt with."

On August 29, 2013, Plaintiff received the "falsified" final copy of the administrative hearing for the rules violation report log number C-13-05-004. In retaliation for Plaintiff utilizing the grievance process Lieutenant Johnson falsified the documents to quote Plaintiff as stating, "It wasn't mine. It was his. No I tell all my cellies, if you have it, I don't want to see it."

On top of falsifying the document he also directed his subordinates to inform the other inmates housed in E-1 "that the Plaintiff's paperwork was faulty and proves he's a snitch." Defendants Johnson, Chan, Franco, O'Daniels, Alva, Esqueda, and Santos began to tell all the inmates to "deal with" Plaintiff "because he's a snitch and he has the paperwork in his cell. He snitched on his old cell Trotter on a possession charge, ask to see his 115 final copy logged number C-13-05004." As a result other inmates requested to view Plaintiff's rules violation report.

///

On September 1, 2013, Plaintiff sent a letter to the warden. On September 20, 2013, and November 9, 2013, Plaintiff sent two more letters to the warden, Ombudsman Office and Office of Inspector General (OIG) explaining the corrupt action taken by prison officials in an attempt to have Plaintiff injured.

On December 3, 2013, the OIG replied to Plaintiff's complaint letter and after investigation found that Plaintiff's claim was unsubstantiated. Plaintiff also spoke with the warden at yard time, and he informed Plaintiff that "there was nothing he could do and that I should apologize to the Lt. and ask him nicely to modify the report."

Throughout the ordeal, Plaintiff and inmate Baker continually requested to be separated. Baker continued to say there is simply too much controversy surrounding the Plaintiff and it was making him look bad because the two were rival gang members and the correctional officers were reporting that Plaintiff was a snitch. Correctional officers would instruct inmate Baker to handle his business and take Plaintiff down.

On September 5, 2013, officers Franco and O'Daniels approached Plaintiff's cell claiming Baker was scheduled to have a conference with his psychologist. As a result, both Plaintiff and Baker were handcuffed, and Plaintiff was advised that he was being moved because Baker was passing love letters to his psychologist claiming to be from Plaintiff.

After Plaintiff and inmate Baker advised officer O'Daniels of the need to be separated, O'Daniels stated "stop acting like bitches and handle your business, that's why ya'll were moved over here where can't nobody hear the screams."

On September 11, 2013, Plaintiff and inmate Baker had a physical altercation inside the cell, and Plaintiff suffered permanent injuries to his lower back, neck, black eye, and an asthma attack due to the responding officers' use of pepper spray to break up the fight.

Plaintiff continuously requested a back brace, cane, and M.R.I. to diagnose and treat his injuries due to the severe pain he was suffering which caused him to collapse without notice. Plaintiff's calls for "man down" were ignored by correctional officers.

On September 28, 2013, officer A. Sanchez escorted inmate Russ to the Plaintiff's cell to initiate a cell compaction. Plaintiff and inmate Russ described that they were not compatible because

1 Plaintiff is "Jewish" and inmate Russ is "Muslim." Officer Sanchez threatened disciplinary action for refusing to cell with inmate Russ, and officer Chan approved the action.

On October 10, 2013, officer Santos introduced himself as the Investigative Employee (IE) assigned to the rules violation report log numbers ASE-13-09-018 (delaying officer and refusing a cellmate) and ASE-13-09-002 (fighting), and asked Plaintiff "what task the Plaintiff wanted him to carry out in preparation of his defense?" Plaintiff submitted a list of witnesses to be questioned and Santos directed Plaintiff "just plead guilty, you were caught fighting and you refused a celly." Plaintiff replied, "nah I want to present the mitigating factors to the committee in an attempt to get the mid or low disciplinary sanction." Santos began arguing with Plaintiff yelling, "just take the guilty plea." No matter how calm the Plaintiff remained Santos continued to yell at him trying to force him to "just plead guilty."

On October 11, 2013, officer Esqueda introduced himself as the working IE, and after opening the file stated, "This is odd, I've never seen this before. Lt. Ybarra is say [sic] I can't question these witnesses for you. Now did he even know what you wanted to ask them." Officer Esqueda asked Lieutenant Ybarra about the witness interviews and Ybarra stated "it looks as if your line of questions are in preparation of a lawsuit. Your cellie already filed a government claims and he's not about to assist ya'll or help build your case."

Officer Esqueda spoke with Lieutenant Ybarra again and then stated "I will question all your witnesses and type this." However, Esqueda never questioned Plaintiff's inmate or staff witnesses and only typed the Plaintiff's affidavit, and purposely falsified in writing that Plaintiff was "sensitive needs yard status."

During the two rules violation hearings conducted by Lieutenant Ybarra, he refused to allow Plaintiff to speak in his defense.

On November 7, 2013, Plaintiff and inmate Badelle were housed together and were compatible cellmates. However, officer O'Daniels approached Plaintiff's cell to initiate a swap of cellmates. After threatening to take all of inmate Badelle's property, Plaintiff and Badelle signed the chrono as directed and as soon as Plaintiff was uncuffed he attacked inmate Dawson.

///

7

# III.

# LEGAL STANDARD FOR FAILURE TO EXHAUST ADMINISTRATIVE REMEDIES

The Prison Litigation Reform Act (PLRA) of 1995, requires that prisoners exhaust "such administrative remedies as are available" before commencing a suit challenging prison conditions." 42 U.S.C. § 1997e(a); see Ross v. Blake, 136 S. Ct. 1850 (June 6, 2016) ("An inmate need exhaust only such administrative remedies that are 'available.' "). Exhaustion is mandatory unless unavailable. "The obligation to exhaust 'available' remedies persists as long as some remedy remains 'available.' Once that is no longer the case, then there are no 'remedies . . . available,' and the prisoner need not further pursue the grievance." Brown v. Valoff, 422 F.3d 926, 935 (9th Cir. 2005) (emphasis in original) (citing Booth v. Churner, 532 U.S. 731, 739 (2001)). This statutory exhaustion requirement applies to all inmate suits about prison life, Porter v. Nussle, 534 U.S. 516, 532 (2002) (quotation marks omitted), regardless of the relief sought by the prisoner or the relief offered by the process, Booth, 532 U.S. at 741, and unexhausted claims may not be brought to court, Jones v. Bock, 549 U.S. 199, 211 (2007) (citing Porter, 534 U.S. at 524).

The failure to exhaust is an affirmative defense, and the defendant bears the burden of raising and proving the absence of exhaustion. Jones, 549 U.S. at 216; Albino v. Baca, 747 F.3d 1166 (9th Cir. 2014). "In the rare event that a failure to exhaust is clear from the face of the complaint, a defendant may move for dismissal under Rule 12(b)(6)." Albino, 747 F.3d at 1166. Otherwise, the defendants must produce evidence proving the failure to exhaust, and they are entitled to summary judgment under Rule 56 only if the undisputed evidence, viewed in the light most favorable to the plaintiff, shows he failed to exhaust. Id.

Defendant must first prove that there was an available administrative remedy and that Plaintiff did not exhaust that available remedy. Williams v. Paramo, 775 F.3d 1182, 1191 (9th Cir. 2015) (citing Albino, 747 F.3d at 1172) (quotation marks omitted). The burden then shifts to Plaintiff to show that something in his particular case made the existing and generally available administrative remedies effectively unavailable to him. Williams, 775 F.3d at 1191 (citing Albino, 747 F.3d at 1172) (quotation marks omitted). The ultimate burden of proof on the issue of exhaustion remains with

Defendant. Williams, 775 F.3d at 1191 (quotation marks omitted).

Where "summary judgment is not appropriate," as to the issue of exhaustion "the district judge may decide disputed questions of fact in a preliminary proceeding." Albino, 747 F.3d at 1168. Whenever feasible, such questions of fact should be "decided before reaching the merits of a prisoner's claim." Id. at 1170. "If the district judge holds that the prisoner has exhausted available administrative remedies, that administrative remedies are not available, or that a prisoner's failure to exhaust available remedies should be excused, the case may proceed to the merits." Id. at 1171.

Furthermore, one of the purposes of an evidentiary hearing is to enable the finder of fact to evaluate the credibility of witnesses by seeing "the witness's physical reactions to questions, to assess the witness's demeanor, and to hear the tone of the witness's voice. . . ." United States v. Mejia, 69 F.3d 309, 315 (9th Cir. 1995). It is only in rare instances that "credibility may be determined without an evidentiary hearing" on the documentary testimony and evidence in the record. Earp v. Ornoski, 431 F.3d 1158, 1169–70 (9th Cir. 2005).

## IV.

### ANALYSIS AND FINDINGS ON EXHAUSTION OF ADMINISTRATIVE REMEDIES

Following the order on summary judgment, the Court found that a disputed issue of fact exists as to whether Plaintiff exhausted his Eighth Amendment claim against Defendant Alva for housing Plaintiff with inmate Baker and Due Process claim against Defendants Ybarra.

In the order denying the motion for summary judgment on the grounds of failure to exhaust, the Court found that Plaintiff presented evidence that he attempted to file an appeal against Defendant Alva within days of being compelled to house with inmate Baker, but the appeals office never replied to it. (ECF No. 99 at 16.) Defendants argued that Plaintiff never filed an appeal relating to Defendant Alva. (Id.) The Court further found that Plaintiff presented evidence that Defendants O'Daniels and Franco obstructed his ability to proceed with appeal number SATF-X-13-04755, and therefore could not exhaust his claim against Defendant Ybarra. (Id. at 17-18.) The Court found that these issues could not be decided on summary judgment because an evidentiary hearing would be required to resolve the disputed facts at issue.

9

An evidentiary hearing was held on October 24, 2018, during which the Court heard the testimony of Jennifer Cota, Jorge Dominquez, Albert Gabriel Chan, Brian O'Daniels, and Plaintiff. (ECF No. 121.) The following exhibits were admitted into evidence: Inmate/Parolee Appeals Tracking System (Defs.' Exs. A, B); Inmate Grievance No. SATF-X-13-04755 for Plaintiff (Defs' Ex. C, 2-7); Third Level Review Inmate Grievance No. SATF-X-13-04755 (Defs.' Ex. D); Inmate Grievance No. SATF-X-13-0592 for Plaintiff (Defs.' Ex. F, 2-4); Inmate Appeal dated August 10, 2013 (Pl.'s Ex. 3, 8-9); Inmate Appeal dated September 23, 2013 (Pl.'s Ex. 4).

### A. Factual Findings

Based on the evidence presented at the evidentiary hearing, the Court makes the following factual findings.

Correctional Counselor II, Jennifer Cota, testified that in 2013, it was her job to review and respond to inmate appeals. (Testimony of Jennifer Cota (hereinafter "Cota Testimony").) In 2013, at SATF, an inmate could submit a 602 appeal through the inmate appeal process, and an analyst would screen the appeal and then assign it to appeal coordinator, after it was logged into inmate appeal tracking system and assigned a log number. (Cota Testimony.) Only one issue can be raised in appeal, and it is required to be submitted within thirty working days. (Cota Testimony.) A copy of Title 15 which contains the administrative appeal procedures is provided to inmates upon request. (Cota Testimony.) An inmate appeal can be rejected, among other reasons, if it untimely, does not contain all necessary supporting documentation, if it contains not all supporting document, contains unrelated issues, or is not signed. (Cota Testimony.) If an appeal is rejected, the inmate can correct the deficiency and return the appeal to the appropriate level of review. (Cota Testimony.)

The Appeals Office required to maintain inmate appeals as part of records. (Cota Testimony.) When an appeal is received in the Appeals Office, it is stamped received, and assigned a log number at that time. (Cota Testimony.) Plaintiff never complained that his inmate appeals were not making it to the Appeals Office. (Cota Testimony.) If an inmate does not receive notice of receipt of an inmate appeal, he may file a CDCR Form 22 to inquiry as to status, write a letter to Warden, write a letter to

Appeals Office, or submit a new inmate appeals regarding inquiring of other appeal.[1] (Cota Testimony).

After the Office of Appeals (Third Level Review) receives an appeal, it is screened and either rejected or accepted. If an appeal is accepted, it is assigned to an examiner for review and issuance of a response. (Testimony of Jorge Dominquez (hereinafter "Dominquez Testimony").) An appeal can be screened out if it does not have the appropriate documentation attached. (Dominquez Testimony.) If an appeal is screened out, a letter is sent to the inmate with directions on how to correct. (Dominquez Testimony.) Every appeal that is received is recorded even those that are screened out. (Dominquez Testimony.) It is not possible to submit an inmate appeal that would not receive a log number. (Dominquez Testimony.) In late 2013, Plaintiff did not have any appeals accepted at third level. (Dominquez Testimony.) In 2014, Plaintiff had two appeals that were received but rejected for missing documents. (Dominquez Testimony.)

Inmates are informed of inmate appeal process and given orientation manual regarding the process and how to file an appeal. (Testimony of Albert Chan (hereinafter "Chan Testimony").) Inmates can request an inmate appeal form during supply pass out. (Chan Testimony.)

If an inmate is confused about the inmate appeal process, he may request a copy of Title 15 of the California Code of Regulations or ask any officer. (Chan Testimony.) To submit appeal in administrative segregation, an inmate must submit it within thirty days of complaint and then put it out for mail pick. (Chan Testimony.) During third watch at approximately 9:00 p.m., an officer would pick up mail from inmates. (Chan Testimony.) The inmate appeal would be placed into a mail bag and then the following day first a watch officer would screen and sort the mail. (Chan Testimony.) After the mail is screened for security issues, it is then placed back into bag for distribution. (Chan Testimony.)

Defendants submitted an Inmate/Parolee Appeals Tracking System for Plaintiff, which lists every appeal received at the Appeals Office. (Cota Testimony; Defs.' Ex. A.) The Inmate Appeals Tracking System reflects that appeal numbers SATF-X-13-03692 and SATF-X-04755 were submitted

---

[1] A CDCR Form 22 is a form an inmate may use to request interviews with staff and/or request items or services through a written procedure. Cal. Code Regs. tit. 15, § 3086(a).

at the third level of review, and appeal number SATF-X-13-03048 was withdrawn by Plaintiff. Inmate Grievance Numbers SATF-X-13-0592 and SATF-X-13-04755 had missing documentation and were returned to Plaintiff to correct and re-submit. (Dominquez Testimony.)

If an officer destroyed an inmate appeal, he would be subject to discipline. (Chan Testimony.) Plaintiff never complained to Mr. Chan about any mishandling of mail, or inmate appeals. (Chan Testimony.) Mr. Chan had no knowledge that Plaintiff ever complained to any officer about mishandling and/or destroying inmate appeals. (Chan Testimony.)

### B. Plaintiff Failed to Exhaust Administrative Remedies as to Claims at Issue

Plaintiff does not dispute that an administrative grievance process was available or that he was familiar with the process. Plaintiff contends that administrative remedies were unavailable because his efforts to exhaust were frustrated and impeded by officers' misconduct. Plaintiff further argues that even the process was not rendered unavailable, the appeals office did not respond, and no instructions were given of what to do when no response has been received.

Failure to exhaust may be excused where the administrative remedies have been rendered "unavailable," and in such a case, the plaintiff bears the burden of demonstrating that the grievance process was unavailable to him through no fault of his own. Sapp v. Kimbrell, 623 F.3d 813, 822-23 (9th Cir. 2010); see also Ward v. Chavez, 678 F.3d 1042, 1044-45 (9th Cir. 2012) (exhaustion excused where futile); Nunez v. Duncan, 591 F.3d 1217, 1224 (9th Cir. 2010) (warden's mistake rendered prisoner's administrative remedies "effectively unavailable"); Brown, 422 F.3d at 939-40 (plaintiff not required to proceed to third level where appeal granted at second level and no further relief was available). Aside from this single exception, "the PLRA's text suggests no limits on an inmate's obligation to exhaust—irrespective of any 'special circumstances.'… [a]nd that mandatory language means a court may not excuse a failure to exhaust, even to take such circumstances into account." Ross, 136 S. Ct. at 1856.

The test for deciding whether a grievance procedure was unavailable uses an objective standard. Albino, 697 F.3d at 1035. "[A]ffirmative actions by jail staff preventing proper exhaustion, even if done innocently, make administrative remedies effectively unavailable." Id. at 1034. An inmate may demonstrate the unavailability of remedies by showing "(1) that jail staff affirmatively

12

interfered with his ability to exhaust administrative remedies or (2) that the remedies were unknowable." Id. at 1033. The inmate must make "a good-faith effort" to determine and comply with a prison's grievance procedures. Id. at 1035.

### 1. Eighth Amendment Claim Against Defendant Alva

Plaintiff submitted an unstamped inmate appeal, dated August 10, 2013, in which Plaintiff claims "C.O. Alva & Sgt. Chan used the threat of reprisal R.V.R.s and threats to confiscate our personal property, extend our SHU terms and a loss of yard privileges to compel inmate Baker and me to force the cell compatibility crono [sic] after we informed them that we are rival gang members who have fought each other in the past, and didn't feel comfortable celling up together. [¶] As a compromise Alva promised us that he would do a cell swap the following day or when ever we find suitable cellies or an empty cell opens up, but it has been approximately 3-4 weeks now that we've been requesting a cell swap to no avail. I have also informed Lt. Johnson about the cell animosity which is on the verge of in cell violence, but for some reason staff is not willing to respect our grievances by accommodating the promised cell moves." (Pl.'s Ex. 3.) Plaintiff also submitted an unstamped inmate appeal, dated September 23, 2013, in which Plaintiff claims "on 8-10-13 I filed a 602 requesting that my celly and I be separated because we are incompatible and have both been requesting a separation for about a month and a half now. I [sic] requesting a response to the 8-10-13 602 or notification of its filing." (Pl.'s Ex. 4.)

Plaintiff testified that on August 10, 2013, either Defendant Franco or O'Daniels picked up the mail because it was always those two officers at night. (Plaintiff Testimony.) Plaintiff further testified that he never received a response to either the August or September 2013, appeals.

Neither Ms. Cota or Mr. O'Daniels recognize the appeals, dated August 10, 2013, and September 23, 2013, and they are not stamped by the Appeals Office. (Cota Testimony; O'Daniels Testimony; Pl.'s Exs. 3, 4.) It is undisputed that Plaintiff never filed a CDCR Form 22 to inform officials that he believed his appeals were lost or destroyed. (Cota Testimony; Plaintiff Testimony.) Ms. Cota testified that she had no first-hand knowledge of lost or destroyed appeals, and she has never heard of the Appeals Office ever losing an appeal. (Cota Testimony.)

///

13

In 2013, Defendant Brian O'Daniels was assigned as a housing unit officer and his primary duty was to conduct security checks every fifteen minutes. (Testimony of Brian O'Daniels (hereinafter "O'Daniels Testimony").) O'Daniels never told Plaintiff that his inmate appeals would not make it out of the building. O'Daniels never disposed of any appeals and never conspired or targeted inmates to get rid of appeals. (O'Daniels Testimony.) O'Daniels does not recall picking up an inmate appeal on August 10, 2013 or September 23, 2013. (O'Daniels Testimony.) Again, O'Daniels main duty was to conduct security checks every fifteen minutes and he would only perform other duties if time permitted. (O'Daniels Testimony.)

Given that O'Daniels testified that his primary duty was to conduct security checks every fifteen minutes, and he only performed other duties if time permitted, the Court does not find Plaintiff's testimony credible that O'Daniels most often picked up his mail. Nor does the Court find Plaintiff's testimony credible that O'Daniels and Franco told Plaintiff that his inmate appeals would never make it out in the mail and were going to be thrown away. Plaintiff's testimony was conclusory in nature and he never observed either O'Daniels or Franco every destroy all appeals. Plaintiff's testimony is also suspect given that during the relevant time frame, Plaintiff submitted three inmate appeals that made it all the way to the third level of review. In addition, in September 2013 through February 2014 (the relevant time period, inmate appeal number SATF-X-13-03692, went back and forth between the Appeals Office and Plaintiff, as the stamp dates reflect. (Defs.' Ex. F.) Furthermore, Plaintiff failed to submit any physical evidence that he ever complained about his mail being tampered with or that inmate appeals were being destroyed, despite having several ways to communicate the alleged misconduct. More specifically, Plaintiff could have talked to officers, he could have talked to librarian, filed a Form 22, talked to any Sergeant, or talked to medical personnel. However, Plaintiff submitted no physical evidence that he ever complained.

Plaintiff testified that inmates are not allowed to make copies of inmate appeal. However, he claimed that he was able to "sneak" the inmate appeals behind other documents for copying. The Court finds it suspect that Plaintiff was able to make a copy of both the August 10, 2013 and September 23, 2013, inmate appeals despite the fact that copying of inmate appeals is specifically provided in the law library. In addition, the inmate appeals are green in color and it is questionable

14

that Plaintiff was able to make a copy of appeals in the law library around the same time that he actually drafted the appeal and submitted it in the mail.

Plaintiff also testified that on September 5, 2013, Defendants O'Daniels and Franco told him that his inmate appeals were being thrown away. Despite the fact that Plaintiff testified he told an Associate Warden about that Defendants Franco and O'Daniels were targeting him and throwing appeals away, and he sent a letter to the Warden and Assistant Warden, Plaintiff submitted no physical evidence to support his contentions, and all the evidence suggests that he did not complain and the court does not find the plaintiff credible in his testimony. In addition, the Court does not find it plausible that Plaintiff's August and September 2013, inmate appeals were destroyed, particularly, given that it is clear an officer may be subject to discipline for doing so. Accordingly, after review of the evidence submitted, the Court finds that Plaintiff failed to exhaust his Eighth Amendment claim against Defendant Alva for housing Plaintiff with inmate Baker, and this claim should be dismissed, without prejudice.

2. <u>Due Process Claim Against Defendant Ybarra, in Part</u>

Plaintiff brings two separate due process claims against Defendant Ybarra relating to the investigation and hearing regarding two Rules Violation Reports (RVR), issued in 2012-RVR ASE-13-09-018 (delaying a peace office by refusing assigned housing) and RVR ASE-13-09-002 (fighting).

With regard to Plaintiff's due process claim against Defendant Ybarra, Plaintiff argues that although he attempted to re-file inmate appeal log number SATF-X-13-04755 on February 14, 2014, he never received a response.

Based on the evidence presented at the evidentiary hearing, it is clear that Plaintiff did not file an appeal with respect to his due process claim relating to RVR ASE-13-09-018 against Defendant Ybarra. In appeal number SATF-X-13-04755, Plaintiff challenged the RVR dated September 28, 2013, for the specific act of "Delaying a Peace office by Refusing Assigned Housing," ASE-09-018. (Cota Testimony; Defs.' Ex. C.) Plaintiff submitted no evidence to dispute this fact, or any other evidence demonstrating that he appealed or attempted to appeal this issue but was prevented from doing so. The evidence submitted demonstrates that appeal number SATF-X-13-04755, Plaintiff challenged only RVR ASE-13-09-018 and made no mention of RVR ASE-13-09-002 for fighting.

Indeed, Ms. Cota testified that she reviewed this appeal and confirmed the sole issue related to RVR ASE-13-09-018, and any attempt to also challenge RVR ASE-13-09-002 would have been screened out because an appeal is limited to one single issue or would have included the challenge in summary of appeal. (Cota Testimony.) Inmate Grievance No. SATF-X-13-04755 was properly screened out on February 6, 2014, because it did not contain supporting documentation. (Dominquez Testimony; Defs.' Ex. B.) Accordingly, Plaintiff failed to exhaust his due process claim against Defendant Ybarra in relation to RVR ASE-13-09-002, and this claim should be dismissed.

## V.

## CONCLUSION AND RECOMMENDATION

Based on the foregoing, the Court finds that Defendants have met their burden of proof in demonstrating that Plaintiff has failed to exhaust the administrative remedies with respect to Plaintiff's Eighth Amendment Claim Against Defendant Alva, and due process claim against Defendant Ybarra in relation to RVR ASE-13-09-002, and recommends that these claims be dismissed, without prejudice.

This Findings and Recommendation will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within **twenty-one (21) days** after being served with this Findings and Recommendation, the parties may file written objections with the Court. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal. Wilkerson v. Wheeler, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated: **May 17, 2019**

UNITED STATES MAGISTRATE JUDGE